## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

UNITED STATES OF AMERICA

v.                                          Criminal No. 3:09cr339

ELUTERRIO S. BROWN, JR.

### MEMORANDUM OPINION

This matter is before the Court on the Defendant's Motion to Dismiss (Docket No. 15). For the reasons that follow, the motion will be denied.

### BACKGROUND

On March 1, 2009, the Defendant, Eluterrio S. Brown, Jr., who had no home save for his car, pulled into the parking lot of a fast food restaurant. Shortly thereafter, Richmond police officers came up to Brown's vehicle to speak with him about a defective taillight. The officers discovered that Brown's license was suspended, then noticed a gun on the front passenger-side floorboard of the vehicle. The officers inspected the gun, observing it to be a .38 special loaded with five bullets. They also found "123 bullets in the trunk, a digital scale with cocaine residue on it in the center console, and 200 small, clear plastic baggies." Gov. Oppo. at 2. State authorities charged Brown with defective equipment, driving on a suspended license, and carrying a concealed weapon.

When a background check indicated a prior conviction for a misdemeanor crime of domestic violence, the United States indicted Brown. The indictment charges him with violating 18 U.S.C. § 922(g)(9), which prohibits the possession of a handgun by a person "who has been convicted in any court of a misdemeanor crime of domestic violence."

The prior domestic violence conviction occurred in 2003, based on an altercation between Brown and his wife in 2002. Brown does not appear to have used a weapon in the 2002 incident. As Brown describes the circumstances, the domestic violence charge was "in the process of being dismissed under a deferred adjudication procedure under Va. Code § 18.2-57.3" when an accident caused him to miss several required domestic violence classes, which triggered his conviction, without an attorney present, on June 30, 2003. Def. Reply at 1 n.1.

Brown seeks to dismiss the indictment, alleging that the statute under which he is charged, 18 U.S.C. § 922(g)(9), violates the Second Amendment to the United States Constitution. Citing the recent decision of District of Columbia v. Heller, 128 S. Ct. 2783 (2008), and subsequent Second Amendment jurisprudence at the circuit level, Brown contends that courts must strictly scrutinize gun laws such as § 922(g) that strike at the heart of a person's Second Amendment right to possess a handgun for self-defense, and argues that § 922(g) cannot survive strict scrutiny.

**DISCUSSION**

**A.    Applicable Law**

Fed. R. Crim. P. 12(b)(3)(B) permits a court to dismiss a defective indictment. An indictment is defective if it alleges a violation of an unconstitutional statute. See <u>In re Civil Rights Cases</u>, 109 U.S. 3, 8-9 (1883). <u>Accord</u> <u>United States v. Walker</u>, 2010 U.S. Dist. LEXIS 39473, at *3 (E.D. Va. Apr. 21, 2010).

To begin, the Court must dispose of the Government's argument that "a defendant may not use a motion under Fed. R. Crim. P. 12(b) to obtain 'summary judgment' on a defense." To support this proposition, the Government cites <u>United States v. Reed</u>, 114 F.3d 1067, (10th Cir. 1997), a decision addressing an anomalous vagueness challenge outside the First Amendment context. There is also a similar line of decisional law, flowing from <u>United States v. Knox</u>, 396 U.S. 77, 84 n.7 (1969), which stated, pursuant to a prior version of Fed. R. Crim. P. 12(b)(1), that "the trial judge [] may consider on a motion to dismiss the indictment only those objections that are 'capable of determination without the trial of the general issue.'" <u>Id.</u> (quoting the prior version of Rule 12(b)(1)). However, as Rule 12(b) is organized today, the text of Rule 12(b)(3) requires that motions alleging a defect in an indictment be made before trial.[1]

---

[1]    Fed. R. Crim P. 12(b)(3) reads, in pertinent part: "The following [motions] must be raised before trial: . . . (B) a motion alleging a defect in the indictment . . . ."

Because the present motion could require consideration of specific facts of the type that would ordinarily be considered at trial, an argument pursuant to <u>Knox</u> and its progeny has some persuasive force. However, the changes to Rule 12(b) require rejection of the Government's argument. Moreover, <u>United States v. Chester</u>, No. 09-4084, 2010 U.S. App. LEXIS 3739 (4th Cir. Feb. 23, 2010), assessed a Second Amendment challenge to § 922(g)(9) in an identical procedural posture to that in which Defendant Brown now sits.[2] Thus, the motion is procedurally proper.

Turning to the constitutional underpinnings of the Defendant's claim, the Second Amendment provides that:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

The challenged statute, 18 U.S.C. § 922(g)(9), forbids the possession of a firearm by any person "who has been convicted in any court of a misdemeanor crime of domestic violence." The phrase "misdemeanor crime of domestic violence" is defined to require "the use or attempted use of physical force, or the

---

2     The Government asserts that "[n]otably, Chester involved a conditional guilty plea, not an attempt as in defendant's present case to obtain effectively a motion for summary judgment on a defense." Gov. Oppo. at 10. There is nothing notable about the conditional guilty plea in <u>Chester</u>, 2010 U.S. App. LEXIS 3739, at *1-2, the case that the Government seeks to contrast with the one now before the Court. The <u>Chester</u> challenge, like this one, was made as a pretrial motion to dismiss; it was only after the motion to dismiss was denied that the defendant entered the conditional guilty plea. <u>Id.</u>

4

threatened use of a deadly weapon" against a close relative or "similarly situated" person. Id. § 921(a)(33)(A). Until very recently, courts considering the constitutionality of § 922(g)(9) during the relatively short time in which it has been in effect[3] have uniformly and rather peremptorily found that the statute did not offend the Second Amendment. See, e.g., United States v. Finnell, 27 Fed. App'x 166, 167 (4th Cir. 2001); United States v. Lewis, 236 F.3d 948, 950 (8th Cir. 2001).

The equation changed, however, when the Supreme Court issued Heller, wherein the Court recognized, in addition to militiamen's armament rights, a "core lawful purpose of self-defense" guaranteed by the Second Amendment. 128 S. Ct. at 2818. The decision invalidated a District of Columbia statute that "generally prohibit[ed] the possession of handguns" by all persons within the District, save for a few narrowly defined exceptions, and prohibited lawful gun owners from keeping them loaded or effectively "functional." Id. at 2788. Thus, at the end of the majority opinion, the Court stated that, "[a]ssuming that [the gun possessor] is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun and must issue him a license to carry it in the home." Id. at 2822.

---

3    Subsection (9) was added to § 922(g) in 1996.    Omnibus Consolidated Appropriations Act, Pub. L. No. 104-208, § 658, 110 Stat. 3009, 3009-372 (1996).

*Heller* recognized, however, that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." Id. at 2816. The decision went on explicitly to disavow any effect "on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," id. at 2816-17, and identified "these presumptively lawful regulatory measures" as exemplary, not to be taken as an exhaustive list, id. at 2817 n.26.

Thus, the Supreme Court identified that the challenged "total ban on handguns" id. at 2788, could not pass constitutional muster, while simultaneously recognizing that some gun regulations would not run afoul of the Second Amendment. Accordingly, some level of constitutional scrutiny appeared necessary for courts to assess the viability of statutes that regulate the possession of firearms. However, the Court provided no guidance on that issue other than eliminating two varieties of scrutiny from the field (rational basis scrutiny and Justice Breyer's proposed "interest-balancing" test), finding that the D.C. gun ban could not survive "any of the standards of scrutiny that we have applied to enumerated constitutional rights," id. at 2817, and hinting at the fundamentality of the right, id. at 2798 ("By the time of the founding, the right to have arms had become fundamental for English subjects."). Instead, the Court merely

observed, cryptically, that "there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." Id. at 2821.

After Heller, most courts considering motions to dismiss indictments charging violations of 18 U.S.C. § 922(g)(9) have relied on the "presumptively lawful regulatory measures" language in Heller, analogizing § 922(g)(9) to § 922 (g)(1), which prohibits felons from possessing firearms, and which Heller held out as an example of a presumptively lawful regulation. See, e.g., United States v. Holbrook, 613 F. Supp. 2d 745, 776 (W.D. Va. 2009) (finding that Heller provided no reason to doubt the legality of § 922(g)(9)); United States v. Booker, 570 F. Supp. 2d 161, 164-65 (D. Me. 2008) ("[P]ersons who have been convicted of a misdemeanor crime of domestic violence must be added to the list of 'felons and the mentally ill' against whom the 'longstanding prohibitions on the possession of firearms' survive Second Amendment scrutiny.") (quoting Heller, 128 S. Ct. at 2816-17). Courts have even observed that there is greater reason to uphold § 922(g)(9) than the presumptively lawful § 922(g)(1). See United States v. White, 593 F.3d 1199, 1206 (11th Cir. 2010) ("[B]oth an armed robber and tax evader lose their right to bear arms on conviction under § 922(g)(1). In contrast, a person convicted under § 922(g)(9) must have first acted violently . . .

7

."); <u>Booker</u>, 570 F. Supp. at 164 ("[A]s a predictor of firearm misuse, the definitional net cast by § 922(g)(9) is tighter than the net cast by § 922(g)(1).").

Two circuit court decisions, however, have viewed <u>Heller</u> as mandating rigorous historical and constitutional examination of regulations that <u>Heller</u> did not explicitly identify as "presumptively lawful." The Seventh Circuit, in <u>United States v. Skoien</u>, 587 F.3d 803 (7th Cir. 2009), *vacated, rehearing en banc granted*, <u>United States v. Skoien</u>, No. 08-3770, 2010 U.S. App. LEXIS 6584 (7th Cir. Feb. 22, 2010), conducted perhaps the most thorough analysis to date of what <u>Heller</u> demands.[4] <u>Skoien</u> criticized the Government for "approach[ing] this case as though all it had to do to defend the constitutionality of § 922(g)(9) is invoke <u>Heller</u>'s language about certain 'presumptively lawful' gun regulations. Not so." <u>Id.</u> at 805.

<u>Skoien</u> observed <u>Heller</u>'s central enigma: some form of heightened scrutiny applies to laws burdening Second Amendment rights, but many regulatory measures that are broad in scope do not, for unarticulated reasons, violate the Second Amendment. <u>Id.</u> at 808. "It is not entirely clear" whether <u>Heller</u> intended that "presumptively lawful regulatory measures . . . fall outside

---

4    Although vacated, <u>Skoien</u> still provides persuasive reasoning, particularly given <u>Chester</u>'s stated agreement with <u>Skoien</u> "insofar as it held that challenges to firearms regulations under the Second Amendment must be individually analyzed because such regulations restrict the exercise of a constitutional entitlement." 2010 U.S. App. LEXIS 3739, at *2-3.

the scope of the Second Amendment right as it was understood at the time of the framing or that they are presumptively lawful even under the highest standard of scrutiny . . . ." Id.[5]

Notwithstanding the acknowledged "analytical difficulty" inherent in the endeavor, Skoien interpreted Heller as advocating a two-step approach to Second Amendment analysis of challenges to gun laws:

> First, some gun laws will be valid because they regulate conduct that falls outside the terms of the right as publicly understood when the Bill of Rights was ratified. If the government can establish this, then the analysis need go no further. If, however, a law regulates conduct falling within the scope of the right, then the law will be valid (or not) depending on the government's ability to satisfy whatever level of means-end scrutiny is held to apply; the degree of fit required between the means and the end will depend on how closely the law comes to the core of the right and the severity of the law's burden on the right.

Id. at 808-09. Or, to summarize, "constitutional text and history come first, then (if necessary) an analysis of the public-benefits justification for the regulation follows." Id. at 809.

---

[5]    However, Heller's observation that "there will be time enough to expound upon the *historical justifications* for the [gun regulations identified as presumptively lawful]," 128 S. Ct. at 2821 (emphasis added), indicates that the Court's pronouncement of the presumptive lawfulness of these regulations was more likely driven by historical analysis than by application of any level of scrutiny.

After observing that the Government had provided no historical justification for the law, Skoien turned to the question of the appropriate level of scrutiny. Skoien suggested that strict scrutiny was proper for regulations that "severely restrict the core Second Amendment right identified in Heller -- that of 'law-abiding, responsible citizens to use arms in defense of hearth and home.'" Id. at 811. However, strict scrutiny could not be proper for all of the regulations identified as "presumptively lawful." Id. at 810. Skoien recognized that the defendant -- as a prior domestic violence misdemeanant, a hunter, and a person who kept his gun in his truck, was "several steps removed from the core constitutional right identified in Heller," because he was not law-abiding, was not using the gun for self-defense, and was not keeping it in his home. Id. at 812. Settling upon intermediate scrutiny, which requires the Government to show, through an "exceedingly persuasive" justification, id. (quoting United States v. Virginia, 518 U.S. 515, 533 (1996)), that § 922(g)(9) served an important governmental interest using means substantially related to the achievement thereof, Skoien observed that the Government had set forth only a conclusory justification, and could not justify the statute on the existing record. Thus, the Seventh Circuit remanded the case to the district court for further review.

The Fourth Circuit's per curiam opinion in United States v. Chester, 2010 U.S. App. LEXIS 3739, at *2 (4th Cir. Feb. 23, 2010), following Skoien's lead, found "that the district court erred when it failed to scrutinize § 922(g)(9) apart from the language in Heller." Without adding or detracting anything from the substance of Skoien, Chester observed that "the district court neither determined the most appropriate level of scrutiny of § 922(g)(9), nor did it substantively apply that level of scrutiny to an analysis of § 922(g)(9)." Id. at *3. Chester instructed the district court to do so on remand, though it declined to adopt the specific two-step approach articulated in Skoien. Chester specifically instructed the parties as follows:

> On remand, [the Defendant] must identify the basis of his claim to Second Amendment protection and make a record to support it; to which the Government may respond. Then the district court can rule based on a full and complete record as to what level of scrutiny applies, thereby creating a sufficient record to permit appellate review.

Id. at *19.

Notably, Chester's instructions did not specifically address the possibility that the district court might find that the gun law "regulate[s] conduct that falls outside the terms of the [Second Amendment] right as publicly understood when the Bill of Rights was ratified," id. at *15 (quoting Skoien, 587 F.3d at 809), or that it affects only people who had been "disqualified

11

from the exercise of Second Amendment rights," _Heller_, 128 S. Ct. at 2822. Instead, _Chester_ decreed "that cases that fall outside the specific exceptions in _Heller_ warrant independent constitutional scrutiny," 2010 U.S. App. LEXIS 3739 at *15, suggesting that refusal to individually scrutinize § 922(g)(9) was not acceptable.

However, although _Chester_ in several instances instructed a district court to select a level of scrutiny and apply it, in addition to conducting the historical analysis, it necessarily implies that, as explicitly stated in _Skoien_, scrutinizing a gun law is unwarranted if the law does not burden conduct protected by the Second Amendment. According to Chester's interpretation of _Skoien_, "laws without the proper historical pedigree" must be subjected to individualized scrutiny. But, given _Chester_'s broad endorsement of _Skoien_ (though noting that district courts are "not bound" to follow _Skoien_'s mode of historical analysis), it would be illogical to read the opinion as requiring independent scrutiny for a gun law that a district court determines, after conducting the requisite historical analysis, to fall outside the scope of Second Amendment protections.

Of course, Skoien was vacated and recently was heard by the Seventh Circuit, sitting _en_ _banc_. The Government contends that _Chester_ is wrongly decided, and urges the Court not to follow

12

this unpublished opinion. Gov. Oppo. Memo. at 10.[6] It asserts the superiority of the Eleventh Circuit approach as articulated in White, 593 F.3d at 1206. White, which, along with the Tenth Circuit (In re United States, 578 F.3d 1195, 1200 (10th Cir. 2009)) and numerous district courts nationwide that have considered the issue, held "that § 922(g)(9) is a presumptively lawful 'longstanding prohibition[] on the possession of firearms'"). White, 593 F.3d at 1206 (alteration in original) (quoting Heller, 128 S. Ct. at 2816-17).

The Court recognizes that Chester, as an unpublished opinion, is not binding. And, as recognized in Walker, even though Chester "rejects the 'prohibition via analogy approach,'" the analogy between the presumptively lawful felony firearm possession ban and the similar (but not listed in Heller) ban on firearm possession for domestic violence misdemeanants is "compelling." 2010 U.S. Dist. LEXIS 39473, at *10-11. Nonetheless, Chester provides the clearest indicator of how the Fourth Circuit would have district courts address the constitutionality of gun laws.

After reviewing the historical pedigree of § 922(g)(9), the Government has established that the statute regulates conduct that the Second Amendment leaves unprotected. Hence, it is

_____

6    It appears that Chester may be headed for panel rehearing; the United States filed a petition on April 8, 2010, that, as of May 24, 2010, the Fourth Circuit had not yet decided.

unnecessary to scrutinize the constitutionality of a law that does not implicate a constitutional right. And, to base a decision alternatively on an assessment that intermediate scrutiny is appropriate for a law that regulates persons with a demonstrated history of violence, and that § 922(g)(9) would withstand such scrutiny, would be to render an advisory opinion, the impropriety of which was acknowledged in Chester, at *17 (citing Michael v. Cockerell, 161 F.2d 163, 164 (4th Cir. 1947)). Thus, the analysis below begins with history, and, because history shows the law's constitutional legitimacy, the analysis ends there as well.

## B. The Basis for the Defendant's Second Amendment Claim

In an effort to place himself at the core of the Second Amendment right articulated in Heller, Brown asserts that he possessed his handgun for self-defense, in his "home." Although Brown's gun was found in his car, Brown was "between homes" at the time, and asks that his car be treated as his home for Second Amendment purposes. The Government proffered no evidence indicating that Brown was not living out of his car at the time. Hence, the spatial basis of Brown's claim will be considered to be the home.

Also, on this record, it appears that Brown was using the gun for protection. Because Brown was found with drug paraphernalia, the Government posits that his handgun was not

used for self-defense, but to facilitate drug-dealing.  Although
the Government has not charged Brown with any drug offenses, it
cites United States v. Jackson, a case in which the defendant was
charged with violating 18 U.S.C. § 924(c) (a statute that
specifically prohibits the possession of guns while dealing
drugs) for the proposition that "there is no constitutional
problem with separating guns from drugs." 555 F.3d 635, 636 (7th
Cir. 2009).  However, on this record, the Government has not
established that Brown was actually dealing drugs, and it has not
even charged him with possession of drugs.  Thus, Brown's
assertion that he carried his weapon for protection of his home
will be taken at face value.[7]

Most of the parties' dispute centers on the extent to which
Brown falls short of being a "law-abiding" person, and thus the
extent to which he is removed from the core Second Amendment
right of "law-abiding, responsible citizens to use arms in
defense of hearth and home." Skoien, 587 F.3d at 811 (quoting
Heller, 128 S. Ct. at 2821).  Brown recognizes that neither he
nor any other person subject to § 922(g)(9) meets the "law-
abiding" criterion strictly, but urges that "Heller does not

---

[7]   Other than to mention Jackson as the basis for a suggestion
that Brown possessed the gun to aid drug dealing, the Government
was content to let the decision be reached without challenging
the assertion that Brown possessed the weapon to protect his
home.   The Court considers that assertion implausible but it
makes no difference to the analysis of the issue presented so it
will not be further considered.

suggest that [the term 'law-abiding'] can or should be construed to mean anyone who has, at some time in the past, committed an unlawful act." Def. Memo. at 10. Brown argues, instead, that the only fact relevant to his law-abiding nature is the predicate domestic violence offense because that is the only element (in addition to gun possession) that is required for a conviction under § 922(g)(9). The Government, on the other hand, asserts that Brown's other past convictions, as well as uncharged conduct at the scene of the arrest, show him not to be "law-abiding."[8]

For purposes of analyzing the basis of the attack on § 922(g)(9), the only operative fact bearing upon whether Brown is law-abiding is the predicate offense of his prior domestic violence misdemeanor conviction. To conduct a fact-intensive analysis of Brown's other unlawful conduct with a view toward labeling him exceedingly afoul of the law, as the Government urges, is not only unwieldy and time-consuming, but would ultimately be standardless (e.g., how many speeding tickets does it take to make a person not "law-abiding"?) and completely unmoored from the Second Amendment's historical foundation.

---

[8] A background check, as updated through the present, also revealed several other convictions and arrests, including a juvenile conviction for assault and another for marijuana possession, adult convictions for marijuana distribution (twice), carrying a concealed weapon (twice), failing to appear, and "making a false report." Gov. Oppo. at 2-3.

However, reducing the assessment to consideration solely of Brown's domestic violence misdemeanor does not render him "law-abiding" for Second Amendment purposes. As Skoien observed, "[§] 922(g)(9)'s prohibition on firearms possession extends only to persons convicted of a misdemeanor crime of domestic violence, not the 'law-abiding, responsible citizens' whose natural right of armed defense was identified in Heller as the central concern of the Second Amendment." 587 F.3d at 812. Moreover, the predicate offense is not a garden-variety misdemeanor. It necessarily is a serious offense, particularly as it relates to the foreseeable consequences of gun ownership by one so convicted. See United States v. Hayes, 129 S. Ct. 1079, 1087 (2009) (noting, in the context of a statutory challenge to the application of § 922(g)(9) to persons convicted of offenses that did not contain a domestic relationship as an offense element, that "[f]irearms and domestic strife are a potentially deadly combination").

Given this background, the basis of the Defendant's claim is that § 922(g)(9), a statute that denies gun ownership to those convicted of serious, criminally violent conduct, violates the Constitution as applied to a person using a gun to defend his home.

## C. Section 922(g)(9) Regulates Conduct Outside the Scope of the Second Amendment Right

As Heller explained, the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 128 S. Ct. at 2821. However, if the Government can establish that a gun law "regulate[s] conduct that falls outside the terms of the right as publicly understood when the Bill of Rights was ratified," Skoien, 587 F.3d at 808-09, then no Second Amendment violation has occurred, and the inquiry is complete. Only "laws without the proper historical pedigree" need face the heightened scrutiny that Heller requires. Chester, 2010 U.S. App. LEXIS 3739 at *15. Thus, the applicable decisional law requires the Court to examine the history of the nation's regulation of gun ownership and assess whether a domestic violence misdemeanant falls within the range of persons whom the Constitution does not recognize as having Second Amendment rights.

Brown contends that § 922(g)(9) unjustifiably removes him from the category of "law-abiding, responsible citizens," Heller, 128 S. Ct. at 2821, who are entitled to full Second Amendment rights. Brown argues that "historical restrictions" on gun ownership were not "based categorically on a broad description of the people governed according to past conduct or misconduct. Rather, those restrictions were based on present conduct, or on time, manner, and place restrictions on possession of arms."

18

Def. Memo. at 10. Because at the time of the founding most felonies were punished by death or exile, Brown contends that felons "were by definition dead in fact or dead to society," Def. Memo. at 4, unlike misdemeanants, who often retained their Second Amendment rights. He also urges that the framers' decision not to include any language limiting the scope of Second Amendment to "peaceable citizens" or the like was an intentional decision, precisely calculated to prevent government from disarming citizens by legislative fiat. Def. Reply at 3-4; Def. Supp. Memo. at 3-6 ("[T]he history of the crafting of the Second Amendment . . . recognized that ostensibly benign federal disarmament efforts were a serious threat to individual liberty."). Brown also notes that misdemeanants typically faced punishments that were less harsh than those meted out to felons. See generally Will Tress, Unintended Collateral Consequences: Defining Felony in the Early American Republic, 57 Clev. St. L. Rev. 461, 463-67 (2009).

Finally, reaching the history of the specific crime underlying his present charge, Brown concludes that "[t]here seems to be no historical basis for saying the Second Amendment allowed a total ban on firearm prohibition by those who committed misdemeanor domestic assaults, mostly because there was not realistically a notion of unlawful domestic assault at that time." Def. Supp. Memo. at 7.

The Government takes a different view of the historical backdrop. Obviously, neither § 922(g)(1) (enacted in 1968) nor § 922(g)(9) (enacted in 1996) were adopted in the founders' generation. In fact, the first federal gun legislation was not passed until the Federal Firearms Act of 1938, c. 850, § 2(f), 52 Stat. 1250, which precluded those who had committed a "crime of violence" from owning a gun.

Like Brown, the Government recognizes that, at the time of the founding, felonies usually were punishable by death or exile, obviating the need for felony firearm restrictions. However, the Government reaches a different conclusion from this lack of early legislation disarming criminals, namely, that it reflected a "lack of political demand." Nelson Lund, The Second Amendment, Heller, and Originalist Jurisprudence, 56 UCLA L. Rev. 1343, 1354 (2009). Firearm possession was left unregulated in the colonial era "as a matter of public policy, not right." Gov. Oppo. at 15. Indeed, as the Government notes, such disarmament would have been highly impracticable in a frontier society, in which isolated communities struggled to survive in rugged conditions. Lawrence M. Friedman, Crime and Punishment in American History 23 (1993); see also id. at 36-37 (describing early colonial settlements as "little worlds on their own . . . a bit like life on a desert island"). At that time, "every man was supposed to keep a gun, [and] every man wanted to keep one and feared to be without one."

Edmund S. Morgan, <u>American Slavery, American Freedom: The Ordeal of Colonial Virginia</u> 240 (1st ed. 1975). This included not simply landowning gentlemen, but "the 'loose and vagrant' fellows who dodged the tax collectors, [and] the small planters who were in debt to their neighbors and on the verge of renewed servitude." <u>Id.</u> "[T]he constant threat of sudden attack by Indians or any of Britain's Dutch, French and Spanish colonial rivals" necessitated a militia consisting of "the entire adult male citizenry, who were not simply *allowed* to keep their own arms, but affirmatively *required* to do so." Don B. Kates, Jr., <u>Handgun Prohibition and the Original Meaning of the Second Amendment</u>, 82 Mich. L. Rev. 204, 214 (1983).

However, asserts the Government, just because congressional disarmament power went unexercised does not mean that it did not exist in latency. As a common law backdrop, the Government correctly points to the extensive power of British Parliament to regulate gun possession, as articulated in the 1689 Declaration of Rights that denied arms to Catholics and granted citizens the right to bear arms only "as suitable to their conditions and as allowed by law." Gov. Supp. Oppo. at 14 (citing 1689 English Declaration of Rights, 1 W. & M., c. 2, § 7, in 3 Eng. Stat. at Large 441 (1698)). Furthermore, British militia lieutenants could disarm persons found "dangerous to the Peace of the Kingdome." <u>Id.</u> at 15 (citing the 1662 Militia Act, 13 & 14 Car.

2, c. 3, § 1 (1662) (Eng.)). In the colonies, Virginia, in 1756, exercised its power to disarm persons who refused to swear to a loyalty oath (although exempting "such necessary weapons as shall be allowed him by order of the justices of the peace at their court, for the defense of his house and person"). Robert H. Churchill, Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment, 25 Law & Hist. Rev. 139, 157 (2007).

The Government also cites a preliminary draft of the Second Amendment, proposed by the anti-federalist[9] faction at the Pennsylvania Convention. This draft would explicitly have allowed the Government to restrict gun ownership of dangerous individuals and/or past criminals. See Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents, (1787), reprinted in John McMaster & Frederick Stone, Pennsylvania and the Federal Constitution, 1787-1788 462 (1888) ("[T]he people have a right to bear arms for the defence of themselves . . . and no law shall be

---

[9]    At the time of the Pennsylvania Proposal, the Anti-Federalist faction was fighting for a Bill of Rights that would guarantee a right to bear arms. See Anthony Gallia, Comment, "Your Weapons, You Will not Need Them:" Comment on the Supreme Court's Sixty-Year Silence on the Right to Keep and Bear Arms, 33 Akron L. Rev. 131, 149 (1999) ("The Anti-Federalists argued that without a Bill of Rights protecting the creation of standing armies, a state of disarmament would occur leading the entire population into oppression."). Thus, such a proposal from an Anti-Federalist camp is particularly probative.

passed for disarming the people or any of them *unless for crimes committed, or real danger of public injury from individuals . . . ."*) (emphasis added). The Government further notes that a Massachusetts proposal would have explicitly extended the right to bear arms only "to peaceable citizens." See Kates, supra, at 224 (describing this proposal by Samuel Adams, "who had taken the modified Anti-Federalist position of conditioning ratification upon the addition of a guarantee of personal rights"). Both of these proposals embody the fundamental concept that the right to bear arms, from its earliest precursors, extended only to those virtuous enough to exercise that right responsibly. As noted in United States v. Rene E., which upheld a law banning juvenile firearm possession, "some evidence [exists] that the founding generation would have shared the view that public-safety-based [firearm possession] limitations . . . were consistent with the right to keep and bear arms. . . . [T]hese limitations were sometimes expressed as efforts to disarm the 'unvirtuous.'" 583 F.3d 8, 15 (1st Cir. 2009) (citations omitted).

This history, which recognizes the legitimacy of gun regulation based on past conduct, informed the common law right to bear arms as articulated in the Second Amendment. And, the notion that a citizen could "disqualify" himself from Second Amendment protections is found in the text of Heller. As noted by the Eleventh Circuit in United States v. Rozier, Heller rested

23

upon an "assum[ption] that [the firearm possessor] *is not disqualified* from the exercise of Second Amendment rights," 598 F.3d 768, 770 (11th Cir. 2010) (quoting, and adding emphasis to, <u>Heller</u>, 128 S. Ct. at 2817). Thus, under this view, "the first question to be asked is . . . whether one is *qualified* to possess a firearm." <u>Id.</u>

Section 922(g)(9) is conceptually rooted in the two clearest historical bases for disarmament, as encapsulated in the Pennsylvania Proposal: "for crimes committed, or real danger of public injury." The statute recognizes the presumptively lawful formula, tacitly endorsed by <u>Heller</u>, of using past criminality as a predictor of future dangerousness. Thus, its historical pedigree is as robust as its intuitive appeal.

Brown correctly notes that the predicate offense underlying § 922(g)(9), a domestic violence conviction, did not exist until well after the time of the founding. However, as observed by a dissenting justice in <u>Heller</u>, and as the majority did not dispute, <u>Heller</u>'s list of "presumptively lawful" gun regulations were not linked to "colonial analogues." 128 S. Ct. at 2870 (Breyer, J., dissenting). Indeed, mapping colonial analogues onto the Constitution as it exists today would produce incongruous results -- while men who beat their wives would remain free to own guns, Catholics and African-Americans, among others, would have no Second Amendment rights.

However, such incongruous results do not follow from an assessment of historical rights in the context of the Constitution as ratified and subsequently amended.[10] The Equal Protection Clause, for example, would prevent race- or religion-based disarmament of broad swaths of the population. The Constitution extends no such protection, however, to the utterly unsuspect class of persons who physically abuse their family members. Such persons may have had a right, by legislative grace, to own guns at the time of the founding, but that right was not enshrined in the Constitution then, nor is it today.

For the foregoing reasons, the Government has established that § 922(g)(9) regulates conduct falling outside the scope of the Second Amendment as understood in light of its history and our nation's constitutional development. Thus, because the statute does not impinge upon the Second Amendment, it is not proper to apply any level of heightened constitutional scrutiny.

## CONCLUSION

For the foregoing reasons, the Defendant's Motion to Dismiss (Docket No. 15) will be denied.

_____ /s/ _____

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: May 25, 2010

_____

[10] To his credit, Brown acknowledged as much during oral argument.